Filed 12/27/24  In re Jayce M. CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re JAYCE M., a Person Coming Under the Juvenile Court Law. | B335664 (Los Angeles County Super. Ct. No. 20CCJP06352A) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> MIRIAM G., <br><br> Defendant and Appellant. | |

APPEAL from orders of the Superior Court of Los Angeles County, Tiana J. Murillo, Judge.  Affirmed.

Leslie A. Barry, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, and Sarah Vesecky, Deputy County Counsel, for Plaintiff and Respondent.

_____

Defendant and appellant Miriam G. (mother) appeals the denial of her petition filed under Welfare and Institutions Code section 388[1] and the termination of parental rights over her son, Jayce M. (Jayce, born Sept. 2016). Mother argues that the juvenile court failed to use the opportunity afforded by her section 388 petition to correct alleged errors made during the disposition hearing 17 months earlier. We affirm.

## FACTS AND PROCEDURAL BACKGROUND

I.   <u>The Family</u>

Jayce is the only child shared by mother and Justin M. (father).[2] In August 2018, father received full physical and legal custody of Jayce. At the same time, father obtained a three-year restraining order protecting himself and Jayce from mother "after

_____

[1]   All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

[2]   Father is not a party to this appeal; our factual and procedural history excludes father's involvement in the case except where necessary to provide context for mother's appeal.

she violently attempted to take[] Jayce while he was in" father's care.[3]

Accordingly, mother had no visitation with Jayce. In August 2019, mother was convicted of second degree robbery (Pen. Code, § 211) and sentenced to eight years in state prison. Her eligible parole date was initially set for October 2025, but the prison later reported that it had been pushed up to January 2025.

In 2020, father and Jayce began living with father's girlfriend and two of Jayce's siblings.[4]

II.    Referral and Detention

On November 30, 2020, father called paramedics for Jayce, who had suffered severe physical injuries and appeared to be developmentally delayed. Medical authorities informed the Los Angeles County Department of Children and Family Services (DCFS). One week later, Jayce was detained from father and DCFS placed him with a foster parent.

Mother's whereabouts were unknown, but DCFS noted that her period of "incarceration exceeds [f]amily [r]eunification timelines."

III.    Jurisdiction Petition

In January 2021, DCFS filed the operative amended jurisdiction petition pursuant to section 300, subdivisions (a) and (b)(1). Among other things, the amended petition alleged father placed Jayce at risk of serious harm by failing to both intervene

---

[3]    Mother was suspected in the arson of father's home, which "burned down while he was out of town." Mother reported the fire to social workers and "requested that Jayce be removed from father's care due to him being homeless."

[4]    Neither sibling is involved in this appeal.

when father's girlfriend physically abused Jayce (counts a-2 and b-2) and obtain medical treatment for Jayce's developmental issues (count b-3). The petition contained no allegations against mother.

IV.     Mother's Appearance

Mother did not appear in the case until her arraignment on April 19, 2021, at which she was appointed counsel. The juvenile court also authorized monitored visitation.

The following month, DCFS spoke to mother for the first time. Mother said that she had last seen Jayce two weeks before she was incarcerated in September 2019, despite the then-active restraining order against her. Mother admitted that she had never tried to regain custody of Jayce, but she expressed a desire "to obtain custody in the future." In the meantime, she asked that custody be given to a maternal relative.

The juvenile court ordered DCFS to assess several maternal relatives for placement, including maternal grandmother and a maternal aunt, who lived together in Chicago, as well as three extended relatives residing in Los Angeles County (the Los Angeles relatives).

On August 3, 2021, DCFS reported that the Los Angeles relatives all declined placement. DCFS also found maternal grandmother's home unsuitable for placement because of her "extensive [and] substantial child welfare history in Los Angeles County."

Meanwhile, mother began telephonic visits with Jayce. By October 2021, mother and Jayce were having weekly monitored phone calls, subject to interruptions caused by "facility issues" at the prison. But these calls eventually became less frequent when "issues . . . at the jail . . . prevented weekly scheduling."

## V. Jurisdiction

On May 18, 2022, the matter proceeded to a jurisdictional hearing.[5]  Mother, appearing as a nonoffending parent, submitted to jurisdiction.  The juvenile court sustained several allegations against father and took jurisdiction over Jayce.

## VI. Disposition Hearing

On August 5, 2022, the juvenile court conducted a disposition hearing.

That same day, DCFS reported that mother was "applying to a . . . program [to] potentially obtain a reduced sentence."  On that basis, DCFS recommended that the court order family reunification services for mother.  At the hearing, mother submitted "on [DCFS's] recommendation[.]"

The juvenile court found "by clear and convincing evidence" "that it would be detrimental to the safety, protection, or physical or emotional well-being, and special needs . . . of [Jayce] to be returned to or placed in the home or the care, custody, and control" of either parent.  It thus removed Jayce from both parents and ordered reunification services.

As to mother, the juvenile court ordered DCFS to make "reasonable efforts to provide" her with services, along with a minimum of six hours of visitation weekly during her incarceration.  The trial court also granted mother's request for an Interstate Compact Investigation (ICPC) to obtain a formal placement assessment from the social services agency in maternal grandmother's jurisdiction.

---

[5]     The matter was continued several times for various reasons, including locating mother and giving her appointed counsel additional time to consult with her.

VII.    Mother's Reunification Efforts

Over the next six months, mother sent letters to Jayce and called him when possible. She also participated in "self-help activities" in prison. However, her application to a transitional reentry program was denied; mother's eligible parole date remained January 2025.

VIII.    Termination of Reunification Services

On February 3, 2023, the matter proceeded to a six-month review hearing.

Mother admitted that Jayce "ha[d] been in placement for two years[,]" but requested an extension of reunification services. She argued that because she was "doing her best to be a mother to [Jayce] while . . . in custody[,]" she deserved "an additional opportunity to make a plan for her child or . . . work to become eligible for [a] program that might allow her to be released and reunify[.]"

The juvenile court denied mother's request, explaining that it could not "reasonably foresee that mother w[ould] be released" during the extension period. The court also noted that although mother "appear[ed] to be making every effort that she can under the circumstances of her incarceration[,]" she had been unable to comply with most of her case plan.

IX.    Placement with Maternal Relatives Is Denied

On March 21, 2023, the ICPC concluded; investigators found that Jayce could not be placed with maternal grandmother and maternal aunt in Chicago. Jayce's foster parent, with whom he was thriving, was designated as his prospective adoptive parent.

6

In December 2023, mother asked DCFS to contact one of the Los Angeles relatives who had declined placement in 2021; the relative declined again.

X. <u>Mother's Continuing Visitation Efforts</u>

After her reunification services were terminated, mother continued to call Jayce and send letters. Despite mother's efforts, DCFS opined that there was "no significant, positive, and emotional attachment" between her and Jayce.

On August 4, 2023, the juvenile court granted mother's request for in-person visits when possible. The following November, DCFS informed the juvenile court that it had not been able to facilitate in-person visits because Jayce was reluctant to visit mother in prison. The juvenile court subsequently ordered DCFS to facilitate an in-person visit.

By January 2024, Jayce had begun ending calls with mother early, usually after two or three minutes. Sometimes he refused to speak with her. On one occasion, Jayce behaviorally regressed during a video call with mother.

On January 2, 2024, Jayce visited mother in prison. They played games and laughed together, but Jayce kept his distance from mother and refused her attempts to hug him. After the visit, Jayce behaviorally regressed again.

XI. <u>Mother's Section 388 Petition</u>

On January 5, 2024, mother filed a section 388 petition asking the juvenile court to change both its February 3, 2023, order terminating reunification services and its August 5, 2022, disposition order removing Jayce from mother.

Mother claimed that her parole eligibility date had been moved to August 2024, and urged the court to grant her custody of Jayce "with . . . an appropriate [care] plan with identified

relatives" during the balance of her incarceration. The petition did not name any relatives who could care for Jayce.[6] In the alternative, mother asked for reinstated reunification services, or that "the identified relatives" be assessed for placement.[7]

On January 26, 2024, the juvenile court held a hearing on the petition.

Mother appeared remotely and offered testimony. She claimed that her "current parole eligible date" was in September 2024, but that she expected to be released in August because of her progress in various prison services. Mother felt that Jayce was bonded to her, and feared that terminating her parental rights would be "detrimental to [Jayce's] mental health because he's already getting accustomed" to her presence in his life.

After hearing argument from counsel, the juvenile court denied mother's section 388 petition. Even crediting mother's testimony that her prison term had been shortened, the court explained that "a release date that is still eight months away roughly from today is not a changed circumstance[,]" especially since mother had been "unable to make an appropriate plan" for Jayce during her incarceration and would herself "be unable to care for [Jayce] . . . [who] has extremely high needs" for the foreseeable future.

---

[6] At the section 388 hearing, mother's counsel clarified that mother had found "one friend that she says would take the child," although counsel admitted that "at this time I do not have further evidence of that. I have reached out to the friend without a response[.]"

[7] As noted above, mother's petition did not identify any relatives.

8

"Even if there were a finding" of changed circumstances, the juvenile court did not "believe . . . it would be in [Jayce's] best interest" to grant any of the changes mother proposed, explaining:  "I cannot . . . order home-of-parent mother . . . as mother remains incarcerated and . . . there is no factual evidence . . . before the court to demonstrate that [she] has or can make an appropriate plan today . . . .  [Regarding a longer period of reunification services,] I don't believe it would be in [Jayce's] best interest . . . to have to wait that long  . . . .  Jayce has had a very traumatic series of events in his very young life.  He's entitled to permanency . . . and I don't believe that asking [him] to wait not just six more months but possibly eight to twelve as there is still no guarantee . . . that mo[ther] will be released . . . is in [his] best interest."

XII.    Termination of Parental Rights

On February 15, 2024, the juvenile court held a permanency planning hearing.  (§ 366.26.)

Mother asserted that the parental benefit exception to adoption applied.  The juvenile court disagreed, finding that while in prison, mother only had limited and inconsistent phone contact with Jayce.  Her "one in-person visit . . . [wa]s the first [such] visit she's had with the child in several years of his life." The court acknowledged that mother's "inability to have more visits is due in part to her custodial status," but found that wasn't "the whole story[,] as [father] did have full custody of [Jayce] when the case was filed, and mo[ther] has noted she didn't have much contact with Jayce before she was arrested in September 2019."

Moreover, the juvenile court found that mother had not shown "that [she] and Jayce had formed a bond . . . .  As mo[ther]

9

testified, she was incarcerated when [Jayce] was two. He's now seven. While . . . mo[ther] . . . was non-offending in the dependency case, the fact here is that [she] was rendered . . . completely unavailable to parent or to make a solid plan for her extraordinarily high needs child[.]" "Jayce's behavior and reaction to the recent in-person contact further underscore[s]" the lack of attachment between him and mother.

The juvenile court concluded that mother failed to "show[] that any hypothetical detriment of severing the parental bond could not be outweighed by the stability of an adoptive home . . . especially . . . for Jayce who . . . has been in the dependency system for quite some time, [and] has ongoing [special] needs[.]" Accordingly, the court terminated her parental rights.[8]

XIII. <u>Appeal</u>

Mother timely appealed.

## DISCUSSION

I.     <u>Section 388 Petition</u>

A.     *Applicable Law*

Under section 388, subdivision (a)(1), a parent may petition the juvenile court to change, modify, or set aside a previous order in dependency proceedings "upon grounds of change of circumstance or new evidence." (§ 388, subd. (a)(1).) "The parent bears the burden to show both a legitimate change of circumstances and that undoing the prior order would be in the best interest of the child." (*In re A.A.* (2012) 203 Cal.App.4th 597, 611–612 (*A.A.*).)

---

[8]     Father's parental rights were terminated at the same hearing.

To satisfy the first prong, "the change in circumstances must be substantial." (*In re Ernesto R.* (2014) 230 Cal.App.4th 219, 223.)  Merely changing—as opposed to changed—circumstances will not suffice. (*In re Mickel O.* (2011) 197 Cal.App.4th 586, 615 (*Mickel O.*).)

For the second prong, specifically when determining whether reinstatement of reunification services is in the child's best interests, the juvenile court must prioritize "the goal of assuring [the child's] stability and continuity[.]" (*In re Angel B.* (2002) 97 Cal.App.4th 454, 464 (*Angel B.*); see also *In re J.C.* (2014) 226 Cal.App.4th 503, 527 (*J.C.*) ["[A]fter . . . services have terminated, a" request to reinstate "reunification efforts must establish how such a change will advance the child's need for permanency and stability"].)

B.     *Standard of review*

We review the denial of a section 388 petition for abuse of discretion. (*Mickel O.*, *supra*, 197 Cal.App.4th at p. 616.)  Thus, we must affirm "unless the [juvenile] court exceeded the limits of legal discretion by making an arbitrary, capricious or patently absurd determination. [Citation.]" (*In re A.S.* (2009) 180 Cal.App.4th 351, 358.)

C.     *The trial court properly denied mother's petition*

Mother's petition failed to meet her burden under both prongs of section 388.  As to the first prong, mother testified that she had secured a new parole eligibility date and could be available to take physical custody as early as August 2024.  Even accepting that unverified date, an earlier parole eligibility date would not necessarily guarantee mother's earlier release. (Pen. Code, § 3041, subd. (b)(1) [authorizing the parole board to deny parole under certain conditions].)  At most, this new date reflects

11

that mother's circumstances were changing, not changed; that alone is a sufficient basis for denying a section 388 petition. (*Mickel O.*, *supra*, 197 Cal.App.4th at p. 615.)

Mother also failed to carry her burden on the second prong. Neither releasing Jayce to her custody nor reopening reunification services would "advance [his] need for permanency and stability." (*J.C.*, *supra*, 226 Cal.App.4th at p. 527.) At the time of the section 388 hearing, Jayce had been thriving in a foster home for over three years, and his foster parent was committed to adopting him. Conversely, Jayce had not lived (or even had regular visits) with mother since father took sole custody in 2018. Although it had been almost three years since mother first appeared in the case, she remained unable to name a suitable caretaker for Jayce during the balance of her incarceration. And in the weeks leading up to the hearing, Jayce started refusing calls with mother and behaviorally regressing after phone and in-person visits.

Continued pursuit of this rocky, unpredictable reunification process would not help assure Jayce's stability and continuity. (*Angel B.*, *supra*, 97 Cal.App.4th at p. 464.) Thus, the juvenile court properly denied mother's petition.

D.    *Mother's counterarguments*

Mother contends that the juvenile court's disposition orders are erroneous; because she is a noncustodial parent, mother claims that the juvenile court should have applied section 361.2, subdivision (a) when removing Jayce from her care. (§ 361.2, subd. (a) ["If a court orders removal of a child pursuant to Section 361, [it] shall first determine whether there is a parent . . . with whom the child was not residing at the time that the events or conditions [leading to dependency] arose . . . who desires to

assume custody of the child.  If that parent requests custody, the court shall place the child with the parent unless it finds that placement with that parent would be detrimental to the safety, protection, or physical or emotional well-being of the child"].)

Mother argues that her section 388 petition was "sufficient to put the [juvenile] court on notice that its disposition orders . . . needed to be corrected."  We disagree for three reasons: (1) Mother forfeited her claim of noncompliance with section 361.2; (2) a section 388 petition is not the appropriate mechanism to address the alleged error; and (3) the disposition orders were not erroneous.

1.  *Forfeiture*

While mother's section 388 petition placed the disposition orders at issue, it did not allege that the juvenile court applied the wrong legal standard when removing Jayce from mother's care.  Mother only argued—both in the petition and through counsel at the hearing—that her incarceration was an insufficient basis for removal.  She thus forfeited any challenge based on the court's alleged failure to apply section 361.2.  (See *A.A.*, *supra*, 203 Cal.App.4th at p. 605 ["Failure to object to noncompliance with section 361.2 in the lower court results in forfeiture"].)

2.  *Section 388 is not the appropriate vehicle for mother's claim*

Even if mother had not forfeited her section 361.2 claim, we would still affirm the denial of her petition, as section 388 is not an appropriate mechanism to seek review of that error.

Section 388 permits a party to petition the juvenile court to change a prior order "upon grounds of change of circumstance or new evidence."  (§ 388, subd. (a)(1).)  A parent may use a section

13

388 petition to seek correction of past legal errors, but usually those errors must stem from new evidence. In such cases, the parents satisfy their burden to show "changed circumstances" by presenting newly discovered evidence showing a legal error was committed in a prior proceeding.[9] (See *In re Jackson W.* (2010) 184 Cal.App.4th 247, 255 [a parent raised past ineffective assistance of counsel by "alleg[ing] numerous instances of counsel's failure to properly represent [the parent]"]; *In re R.A.* (2021) 61 Cal.App.5th 826, 834 [a father demonstrated his due process claim by showing that he "did not receive notice when the original [jurisdiction] petition was filed"].)

Mother's section 388 petition presents no new evidence relevant to the alleged section 361.2 error. The only new facts described in the petition are mother's updated release date, her recent completion of programs in prison, and her suggestion of a new, unnamed potential caregiver for Jayce. These changes could provide support for a brand new disposition order (which mother unsuccessfully sought at the section 388 hearing), but they do not show that the trial court applied the wrong legal

---

[9] A section 388 petition can also address unusually grave legal errors that fatally undermine a parent's ability to develop evidence that a proposed modification would be in her child's best interest. (*See, e.g.*, *In re Hunter S.* (2006) 142 Cal.App.4th 1497, 1507–1508 [abuse of discretion to deny a petition asking the juvenile court to correct its failure to enforce a mother's visitation rights for three years].) In these extreme circumstances, appellate courts have relieved the petitioning parent of her burden to present evidence on both prongs of section 388. (*Hunter S.*, *supra*, at p. 1508.) Because mother does not contend—and we do not find—that such exceptional circumstances are present here, she cannot advance her petition without satisfying her evidentiary burden.

14

standard when making its initial removal findings 17 months earlier.[10]

### 3. *The juvenile court did not err at the disposition hearing, and in any event, the alleged error would have been harmless*

In the interest of thoroughness, we note that even if mother's section 361.2 claim could be raised via a section 388 petition, the juvenile court's disposition orders were not in error.

Because Jayce was not residing with mother when "the events or conditions arose that brought the child within the provisions of [s]ection 300" in November 2020, "the court was required under section 361.2 to place [him] with [mother] unless such placement would be 'detrimental to [his] safety, protection, or physical or emotional well-being[.]'" (*In re Adam H.* (2019) 43 Cal.App.5th 27, 32 (*Adam H.*).)

However, "[i]t is the noncustodial parent's request for custody that triggers application of section 361.2 . . . ; where the noncustodial parent makes no such request, the statute is not applicable." (*A.A.*, *supra*, 203 Cal.App.4th at p. 605.) Mother concedes that she did not request custody of Jayce or otherwise "assert [her] rights under section 361.2 at the disposition hearing." Because she did not trigger section 361.2, the juvenile court did not err by failing to apply it.

Even if mother had requested custody, noncompliance with section 361.2 would be harmless. (See *Adam H.*, *supra*, 43 Cal.App.5th at p. 32 [failure to comply with section 361.2 is

---

[10] Our conclusion does not leave mother without means to correct the alleged error; she could have appealed the disposition orders or filed a "writ following the setting of the section 366.26 hearing." (*A.A.*, *supra*, 203 Cal.App.4th at p. 606.)

15

subject to harmless error review].)  "An incarcerated parent has the same right as other parents to be given the opportunity to request custody under section 361.2," but the juvenile court may deny placement if that parent is unable "to make appropriate arrangements for the care of the child [during her] incarceration." (*A.A.*, *supra*, 203 Cal.App.4th at p. 606; *In re Noe F.* (2013) 213 Cal.App.4th 358, 368 (*Noe F.*).)

As mother conceded in her section 388 petition, she "was unable to make an appropriate [care] plan at the time of [d]isposition[.]"  In fact, mother could not make *any* arrangement for Jayce's care throughout these proceedings; in three years, she named five maternal relatives as potential caregivers, all of whom either declined or were found unsuitable.  Thus, while the juvenile court did not apply section 361.2, that statute would have supported the court's finding that granting mother custody would be detrimental to Jayce.  (Cf. *Noe F.*, *supra*, 213 Cal.App.4th at p. 367 ["[I]nsufficient evidence supports removal . . . from" an incarcerated parent where she "identified two suitable caregivers . . . who[] were willing to take the child"].)

Under these circumstances, any failure to apply section 361.2 was harmless.  Thus, we cannot conclude that the juvenile court abused its discretion in denying mother's purported request to correct the error.

II.     Termination of Parental Rights

Mother only raises one argument against the termination of her parental rights—namely, that the juvenile court's erroneous denial of her section 388 petition violated her due process rights.  Having already determined that the juvenile properly denied the petition, we affirm the termination of mother's parental rights.

16

**DISPOSITION**

The orders are affirmed.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.


_____, Acting P. J.
ASHMANN-GERST


We concur:


_____, J.
CHAVEZ


_____, J.
RICHARDSON


17